FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- x

In re:                                          :          Chapter 11
                                                :
**JOHNS-MANVILLE CORP. ET AL.,**                :          Case Nos. 82 B 11656 (CGM)
                                                :          through 82 B 11676 (CGM)
                                     Debtors.   :          inclusive
                                                :
--------------------------------------------------------- x


--------------------------------------------------------- x
In re:                                          :
                                                :
**MANVILLE FOREST PRODUCTS**                    :          Chapter 11
**CORPORATION**,                                :
                                                :          Case No. 82 B 11659 (CGM)
                                                :
                                     Debtor.    :
--------------------------------------------------------- x


## MEMORANDUM DECISION GRANTING GRAPHIC PACKAGING INTERNATIONAL'S MOTION FOR AN INJUNCTION


A P P E A R A N C E S :

United States Trustee
271 Cadman Plaza East, Suite 4529
Brooklyn, NY 11201
*Counsel to the United States Trustee*
        By:     Alicia Leonhard

Davis Polk & Wardwell, LLP
450 Lexington Avenue
New York, NY 10017
*Counsel for Graphic Packaging International, Inc.*
        By:     James I. McClammy
                Rebecca L. Martin

Kean Miller, LLP
400 Convention Street #700
P.O. Box 3513
Baton Rouge, LA 70802
*Co-Counsel for Graphic Packaging International, Inc.*
        By:     J. Eric Lockridge

Montgomery McCracken Walker & Rhoads LLP
1105 North Market Street
Wilmington, DE 19801
*Counsel for Lynda Berry*
        By:    Natalie D. Ramsey
               Mark A. Fink

Dean Omar & Branham, LLP
3900 Elm Street
Dallas, TX 75226
*Co-Counsel for Lynda Berry*
        By:    Charles W. Branham, III

**CECELIA G. MORRIS**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Before the Court is Graphic Packaging International's ('Graphic") emergency motion for enforcement of the confirmation orders of the Johns-Manville Corporation ("Manville") and the Manville Forest Products Corporation ("MFP"). By its motion, Graphic seeks to enjoin the lawsuit of plaintiff, Lynda Berry ("Ms. Berry"), brought in Louisiana state court against Graphic for alleged asbestos liability. *See* Graphic's Emergency Mot. 2, Feb. 29, 2016, ECF No. 4204.[1] Graphic argues that as it is a successor of MFP, a bankruptcy debtor and a wholly-owned subsidiary of Manville, Ms. Berry must first pursue her asbestos claims against the Manville Personal Injury Trust (the "Trust"). Mem. Law Supp. Emergency Mot. 12, Feb. 29, 2016, ECF No. 4205 ("Graphic's Mot."). In response, Ms. Berry argues that her lawsuit should not be enjoined as her claims were not discharged or enjoined by the MFP confirmation order ("MFP Confirmation Order"), MFP is not a beneficiary of the Manville confirmation order ("Manville Confirmation Order") or channeling injunction, and Graphic has waived its right to enforce the bankruptcy Confirmation Orders and injunction. Resp. and Obj. of Berry 1, Mar. 4, 2016, ECF

---

[1] Unless otherwise indicated, all litigation documents cited to herein can be found on docket number 82-11656.

No. 4212 ("Berry's Opp'n"). Ms. Berry also argues that she did not receive due process. *Id.* at 14–17.

After a hearing before this Court, held on March 8, 2016, Ms. Berry requested an evidentiary hearing with regard to due process. Tr. Mar. 8, 2016 Hrg. 20:20–23, Mar. 8, 2016, ECF No. 4225 ("Tr."). This Court ordered supplemental briefing on the matter. Tr. 26:1–7. For the reasons and to the extent stated below, the Court grants Graphic's motion for an order enjoining Ms. Berry's state law claims against Graphic as a successor to MFP.

## Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Chief Judge Loretta A. Preska dated January 31, 2012. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A), matters concerning the administration of the estate, and § 157(b)(2)(I), proceedings to determine the dischargeability of debt.

As provided in both the MFP and Manville Confirmation Orders, paragraphs 10 and 28 respectively, this Court retains jurisdiction to clarify its prior confirmation orders, to enforce its injunctions, and to adjudicate matters having to do with the administration of the confirmed chapter 11 plans of MFP and Manville. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (citations omitted).

## Background

After over thirty years of handling the ongoing Manville bankruptcy case, this Court is keenly aware that "[f]undamentally, the story of asbestos health litigation is the story of Johns-Manville." *In re Johns-Manville Corp.*, 2004 Bankr. LEXIS 2519, at *5 (Bankr. S.D.N.Y. Aug. 17, 2004), *aff'd in part, vacated in part*, 340 B.R. 49 (S.D.N.Y. 2006), *vacated sub nom. Johns-*

*Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52 (2d Cir.

2008), *rev'd and remanded sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009). As

documented by this Court, Manville's story began in 1868, when "Henry Ward Johns had

obtained a patent for an asbestos insulation product," leading to the establishment of his

business, the H.W. Johns Company. *In re Johns-Manville Corp.*, 2004 Bankr. LEXIS 2519, at

*6 (citations omitted). H.W. Johns sold its asbestos products through the Manville Covering

Company. *Id.* The two companies merged in 1901, becoming the "H.W. Johns-Manville

Company." *Id.* at 6–7.

Manville was "a diversified manufacturing, mining and forest products company," and by

the 1970s was "the world's largest miner, processor, manufacturer and supplier of asbestos and

asbestos-containing products." *GAF Corp. v. Johns-Manville Corp. (In re Johns-Manville

Corp.)*, 26. B.R. 405, 407 (Bankr. S.D.N.Y 1983), *aff'd sub nom. Johns-Manville Corp. v.

Asbestos Litig. Grp. (In re Johns-Manville Corp.)*, 40 B.R. 219 (S.D.N.Y. 1984); *see also In re

Johns-Manville Corp.*, 2004 Bankr. LEXIS 2519, at *7 (citations omitted). Manville was not

only a leading producer of asbestos products, these products "were used pervasively in a variety

of industries for several decades throughout the United States." *Manville Corp. v. Equity Sec.

Holders Comm. (In re Johns-Manville Corp.)*, 66 B.R. 517, 521 (Bankr. S.D.N.Y. 1986).

Although asbestos products were widespread, the asbestos industry consisted of about thirty

manufacturing firms that made asbestos products. John C. Coffee, Jr., *Class Wars: The Dilemma

of the Mass Tort Class Action*, 95 Colum. L. Rev. 1343, 1365 (1995).

Manville eventually became "*the* prime supplier of asbestos fiber products," *In re Johns-

Manville Corp.*, 2004 Bankr. LEXIS 2519, at *7, and a Fortune 500 company. *In re Johns-

Manville Corp.* 97 B.R. 174, 176 (Bankr. S.D.N.Y. 1989). Manville was "deemed a paradigm of

success in corporate America by the financial community." *In re Johns-Manville Corp.*, 36 B.R.

727, 729 (Bankr. S.D.N.Y 1984). Such was Manville's success in the asbestos industry that

Manville's bankruptcy filing was surprising. *Id.* In fact, it was "the spectre of proliferating,

overburdening litigation to be commenced in the next 20–30 years, which litigation would be

beyond [Manville's] ability to manage, control, and pay for, which . . . prompted this filing." *In

re Johns-Manville Corp.*, 36 B.R. 743, 745 (Bankr. S.D.N.Y. 1984), *aff'd*, 52 B.R. 940

(S.D.N.Y. 1985).

The term "asbestos" describes "a group of naturally occurring fibrous minerals known for

their properties of relative indestructibility and resistance to heat and fire." John P. Burns et al.,

*Special Project: An Analysis of the Legal, Social, and Political Issues Raised by Asbestos

Litigation*, 36 Vand. L. Rev. 573, 578 (1983) (footnote omitted), *cited in Stonewall Ins. Co. v.

Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1192 n.6 (2d Cir. 1995). The documented use of

asbestos dates back to the ancient Greeks and Romans and was used with increasing frequency

after the industrial revolution in the 1870s. *Id.* at 578 (citing James W. Mehaffy, *Asbestos-

Related Lung Disease*, 16 Forum 341, 341-42 (1980)). Despite its prevalent use, the dangers of

asbestos were not widely known until the 1960s when latent asbestos injuries began to manifest

throughout the nation. *In re Asbestos Prods. Liab. Litig.*, 771 F. Supp. 415, 418 (J.P.M.L. 1991)

(quoting Judicial Conf. of the U.S., Report of the Judicial Conference Ad Hoc Committee on

Asbestos Litigation 1–3 (1991)).

The health risks caused by asbestos were finally given broad acknowledgment on the

legal front in 1973, when the United States Court of Appeals for the Fifth Circuit issued its

landmark decision in *Borel*. *Borel v. Fibreboard Paper Prod. Corp.*, 493 F.2d 1076 (5th Cir.

1973). In *Borel*, the Fifth Circuit upheld a jury verdict finding asbestos manufacturers, including

Manville, strictly liable for personal injuries of the plaintiff resulting from exposure to asbestos.
*See id.* at 1086.  The Fifth Circuit's decision found that "[a]sbestosis has been recognized as a
disease for well over fifty years," with some of the earliest known cases dating back to the
1920s.  *Id.* at 1083 (footnotes omitted).

Since the Fifth Circuit's decision in *Borel*, asbestos litigation has grown to gargantuan
proportions.  Patrick M. Hanlon & Anne Smetak, *Asbestos Changes*, 62 N.Y.U. Ann. Surv. Am.
L. 525, 526–27 (2007).  The judiciary has repeatedly called for Congress to create a national
scheme to resolve all asbestos claims.  *See* John C. Coffee, Jr., *Class Wars: The Dilemma of the
Mass Tort Class Action*, 95 Colum. L. Rev. 1343, 1389 (1995) (footnotes omitted); *see also
Amchem Prods. v. Windsor*, 521 U.S. 591, 598 (1997) (discussing the March 1991 Report of the
Judicial Conference Ad Hoc Committee on Asbestos Litigation, appointed by the Chief Justice in
September of 1990); *In re Asbestos Prods. Liab. Litig.*, 771 F. Supp. at 418.  As recently as 2003,
the Supreme Court again recognized the need for national legislation to deal with the
"elephantine mass of asbestos cases lodged in state and federal courts."  *Norfolk & W. Ry. Co. v.
Ayers*, 538 U.S. 135, 166 (2003) (internal quotation marks omitted) (quoting *Ortiz v. Fibreboard
Corp.*, 527 U.S. 815, 821 (1999)).  Congress has not heeded the call.

Although original asbestos litigation involved an individual plaintiff and asbestos
producer, this landscape changed by the 1980s.  After years of litigating individual cases,
asbestos producers coalesced into an industry-wide consortium, presenting a unified litigation
front.  Coffee, *supra*, at 1364–66.  The original asbestos consortium was known as the Asbestos
Claims Facility.  *Id.* at 1365 & n.83.  The Asbestos Claims Facility evolved into the Center for
Claims Resolution ("CCR") after several of the original members filed for bankruptcy.  *See id.* at
1365 n.83; *Amchem*, 521 U.S. at 599–600.  Counsel for asbestos plaintiffs were also operating on

a narrow playing field.  There were fewer than 50 firms representing asbestos plaintiffs, with most cases concentrated in the hands of a few.  *See* Coffee, *supra*, at 1364–65, 1392 & nn.187–88 (citations omitted); *Amchem*, 521 U.S. at 599.  Representation of asbestos plaintiffs was led by the firms of Ronald Motley and Gene Locks.  *See* Coffee, *supra*, at 1364–65, 1392 & nn. 187–88 (citations omitted); *Amchem*, 521 U.S. at 599.  At the legal level, asbestos litigation was essentially a game between "repeat players."  Coffee, *supra*, at 1365.

While asbestos plaintiffs were vigorously suing asbestos defendants, Manville and its insurance firms were disputing which among them should bear the brunt of the mounting asbestos liability.  *See In re Johns-Manville Corp.*, 36 B.R. 743, 750 (Bankr. S.D.N.Y. 1984).  About twenty-five insurance carriers,[2] "who wrote approximately 100 policies for Manville, ha[d] by and large refused to provide defense and indemnity to Manville in asbestos cases."  *Id.*  One of the major reasons Manville filed for bankruptcy was "its inability to look to at least $600 million in insurance coverage" to pay out on and defend against its growing asbestos liabilities.  *Id.*

---

[2] Manville had two main groups of insurers: those that issued policies in force at the time many asbestos plaintiffs were exposed to asbestos, and those that had issued policies that were in force at a later time, when many of the asbestos plaintiffs were manifesting symptoms.  *In re Johns-Manville Corp.*, 36 B.R. 743, 750 (Bankr. S.D.N.Y. 1984).  Each group argued a conflicting legal theory as to what occurrence triggered insurance coverage.  The insurers that had issued earlier policies argued that manifestation of the symptoms of asbestos-related diseases triggered insurance coverage.  *Id.*  The insurers that had policies in force at the time large numbers of people were manifesting symptoms argued the opposite, that insurance coverage was triggered by exposure.  *Id.*  The majority of courts faced with this insurance issue have held that insurance coverage can be triggered at the time of exposure.  *Id.* at 749-50 (citing *Ins. Co. of N. Am. v. Forty Eight Insulations, Inc.*, 633 F.2d 1212, 1223 (6th Cir. 1980); *Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1045 (DC Cir. 1981); *Porter v. Am. Optical Corp.*, 641 F.2d 1128, 1131 (5th Cir. 1981)).  The time an asbestos victim has to seek recovery for injuries resulting from exposure has not been interpreted so uniformly.  Courts in many states have held that the statute of limitations for asbestos injuries begins to run at the time of discovery.  *See Karjala v. Johns-Manville Products Corp.*, 523 F.2d 155, 161 (8th Cir. 1975).  Although discovery commonly happens around the time symptoms begin to manifest, discovery is not synonymous with manifestation.  The Fifth Circuit has held that discovery occurs when an individual asbestos claimant discovered or should have discovered with the exercise of reasonable diligence, the existence of a possible asbestos condition.  *Fusco v. Johns-Manville Products Corp.*, 643 F.2d 1181, 1183 (5th Cir. 1981).  Discovery may occur when the asbestos claimant became aware of the dangers of asbestos, knew that he or she had been exposed, and was warned of the possibility of contracting an asbestos-related disease.

On August 26, 1982, Manville and twenty of its subsidiaries filed for protection under chapter 11 of the Bankruptcy Code. *See In re Manville Forest Prods. Corp.*, 31 B.R. 991, 992 (S.D.N.Y. 1983); *In re Johns-Manville Corp.* 97 B.R. 174, 176 (Bankr. S.D.N.Y. 1989). An order of this Court entered on the same day as the filings "provides for joint administration of the 21 Manville companies." *In re Manville Forest Prods. Corp.*, 1983 U.S. Dist. LEXIS 15457, at *5 (S.D.N.Y. July 14, 1983). MFP was one of these original Manville debtors, filing for bankruptcy on the same day as Manville, and as part of the Manville bankruptcy. *See In re Manville Forest Prods. Corp.*, 31 B.R. at 992; Graphic's Suppl. Br. 15–16, Apr. 11, 2016, ECF No. 4230 (citing Graphic's Mot. Ex. S, at 35).

MFP was "a timber company that was acquired by Johns-Manville through a hostile tender offer in 1978." *In re Manville Forest Prods. Corp.*, 31 B.R. at 992. As part of its forest products business, MFP had acquired the West Monroe paper mill (the "Mill"). *See* Berry's Opp'n 2, 6–7; Graphic's Mot. 4. Originally, the Mill belonged to the Brown family who sold it to Olin Corporation in 1955. *See Graves v. Riverwood Int'l Corp.*, 949 So. 2d 576, 579 (La. Ct. App. 2007).[3] On January 1, 1967, Olin Corporation sold its forest products division, including the Mill, to Olinkraft, Incorporated ("Olinkraft"). *See id.* In May of 1974, Olinkraft become a publically owned company. *Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Products Corp.)*, 209 F.3d 125, 126 (2d Cir. 2000). As already stated, MFP was acquired by Manville through a hostile takeover in 1978. It is undisputed that MFP was a wholly-owned subsidiary of Manville at the time of the bankruptcy filing. *See* Tr. 15:13–16:12; *In re Manville Forest Prods. Corp.*, 31 B.R. at 992; *In re Manville Forest Prods. Corp.*, 43 B.R. 293, 295 (Bankr. S.D.N.Y. 1984), *aff'd in part, rev'd in part*, 60 B.R. 403 (S.D.N.Y. 1986); *Manville Forest Prods. Corp. v.*

---

[3] Both parties refer to this case in their papers. *See* Berry's Opp'n 19; Graphic's Reply 8, Mar. 7, 2016, ECF No. 4217. Graphic asserts that the judgment in the case was against Olin Corporation, a corporation that is legally distinct from MFP and Graphic. Graphic's Reply 8.

*Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 89 B.R. 358, 360 (Bankr. S.D.N.Y. 1988).

Although MFP "never mined, manufactured or sold asbestos or any asbestos-containing product," *In re Manville Forest Products Corp.*, 43 B.R. at 295, MFP "apparently fearing derivative liability [for Manville asbestos claims]," filed a chapter 11 petition for reorganization. *In re Manville Forest Products Corp.*, 60 B.R. 403, 404 (S.D.N.Y. 1986). At the urging of MFP's creditors, MFP proposed its own plan of reorganization on October 17, 1983. *In re Manville Forest Products Corp.*, 43 B.R. at 296; *In re Manville Forest Products Corp.*, 31 B.R. at 994. This Court confirmed MFP's separate plan of reorganization on March 26, 1984. *See In re Manville Forest Products Corp.*, 60 B.R. 403, 404 (S.D.N.Y. 1986); *In re Manville Forest Products Corp.*, 31 B.R. at 994; *see also* Graphic's Mot. Exs. L, M. MFP's Confirmation Order incorporates MFP's First Amended and Restated Plan (MFP's "Plan"). Graphic's Mot. Ex. M, at 5. In keeping with § 1141(d)(1) of the Bankruptcy Code, the MFP Confirmation Order and Plan discharge MFP from all unsecured, pre-confirmation debts. Graphic's Mot. Ex. M, at 6; *Riverwood Int'l Corp. v. Olin Corp. (In re Manville Forest Prods. Corp.)*, 225 B.R. 862, 864 (Bankr. S.D.N.Y. 1998) (citations omitted); *Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Products Corp.)*, 209 F.3d 125, 127 (2d Cir. 2000).

After MFP confirmed its plan of reorganization, it changed its name to Riverwood International Corporation ("Riverwood"). *See Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Products Corp.)*, 209 F.3d 125, 127 (2d Cir. 2000). Manville retained its majority ownership interest in the company. *See Clay v. Riverwood Int'l Corp.*, 157 F.3d 1259, 1261 (11th Cir. 1998). Several years later, "[i]n early 1995, Riverwood's 81 percent stockholder, Manville Corporation, found itself in need of cash to settle asbestos litigation

claims." *Clay v. Riverwood Int'l Corp.*, 157 F.3d 1259, 1261 (11th Cir. 1998). As a result,

Riverwood was spun off and sold. *See* Graphic's Mot. 6. Riverwood merged with Graphic in

2003, adopting Graphic's corporate name. Graphic's Mot. 6; *see also Riverwood Int'l Corp. v.

Emplrs Ins. of Wausau*, 420 F.3d 378, 380 (5th Cir. 2005). Before Riverwood merged with

Graphic in 2003, Riverwood was sued by its employees for asbestos-related injuries. *Riverwood

Int'l Corp. v. Emplrs Ins. of Wausau*, 420 F.3d 378, 380 (5th Cir. 2005). "Riverwood settled 260

employee claims for a lump sum of $ 1.513 million." *Id.* Riverwood attempted to recover on its

insurance policies in force at the time from multiple insurance companies. *Id.* At least one of its

insurers refused to contribute and the Fifth Circuit held that the insurer's policy's terms did not

cover personal injuries resulting from exposure to asbestos. *See id.*

## ARGUMENTS OF THE PARTIES

Ms. Berry now seeks to sue Graphic directly on her asbestos personal injury claims. On

August 24, 2015, Ms. Berry filed a petition for damages in Louisiana state court. Ms. Berry

seeks to recover against Graphic based on her derivative exposure to asbestos through her

husband's work at the Mill. Berry's Opp'n 2–3, Ex. 6. Ms. Berry's husband worked at the Mill

from 1961 to 2010, where he was exposed to asbestos and suffered his own asbestos-related

injuries as a result. *Id.* at 5–6. Ms. Berry's husband filed a claim with the Trust for his injuries

and received payment on his claim. *Id.* at 18; Tr. 8:1–15; 10:11–14. Ms. Berry was diagnosed

with mesothelioma in March of 2015. Berry's Opp'n 4. She seeks damages for her asbestos-

related injuries based on strict liability of the asbestos producers and distributors, which includes

Manville, as well as the strict liability and negligence of the employer and premises owner, who,

at the time, was MFP. *Id.* at 18, Ex. 6 ("Petition for Damages"). Ms. Berry's petition thus

includes claims against Manville for asbestos it produced, and claims against Graphic for negligently maintaining the premises.

Graphic now seeks the protection of the bankruptcy court. Graphic alleges that Ms. Berry's law suit violates both MFP and Manville's Confirmation Orders, and that her claim should be enjoined by those orders. Graphic's Mot. 1–2. Graphic argues that Ms. Berry's only recourse for her asbestos related injuries is to submit a claim to the Manville Trust. Tr. 8:9–19. In opposition, Ms. Berry argues that (1) MFP is not a beneficiary of the Manville confirmation order and channeling injunction; (2) Ms. Berry's claims against MFP were not discharged, released or enjoined by the MFP Confirmation Order; (3) even if Ms. Berry's claims were addressed by the MFP or Manville Confirmation Orders, her exposure was continuing, so her claims are not discharged, released, channeled or enjoined by the MFP or Manville Confirmation Orders; and (4) Graphic has waived its right to rely on the bankruptcy discharge or injunction. *See* Berry's Opp'n 1. Ms. Berry admits that any claim she may have for exposure to Manville's asbestos would be channeled to the Manville Trust. Berry's Opp'n 3, 18. Ms. Berry contends that her claim against Graphic is not channeled due to the fact it is a claim based on premises liability, which was not included in the Manville Plan or Confirmation Order. *Id.*; *see also* Berry's Suppl. Br. 5, Mar. 29, 2016, ECF No. 4226; Tr. 15:2–11. Ms. Berry further argues that she did not receive due process in the underlying bankruptcy proceedings leading to MFP and Manville's confirmation orders. Berry's Suppl. Br. 21–36.

As will be explained below, Ms. Berry's lawsuit against MFP is merely an attempt to side-step the Manville Trust in order to recover more than other similarly situated asbestos victims by suing Manville and its subsidiaries directly. This is not merely unfair to the other victims, it is an attempt to sue on rights she does not have. Were it not for the Manville Trust,

Ms. Berry's claims against MFP would have been discharged and she would not be entitled to

any recovery for her asbestos related injuries. As it is, this Court finds that Ms. Berry holds a

future asbestos claim, subject to the injunction in the Manville Plan and Confirmation Order,

which channels direct and indirect claims against Manville to the Manville Trust and enjoins all

persons holding future asbestos claims from suing Manville and Manville's subsidiaries.

### Discussion

Any direct claim Ms. Berry has against MFP would be a prepetition claim subject to

discharge by MFP's Plan. Pursuant to § 1141(d)(1) of the Bankruptcy Code, and as held by this

Court and affirmed on appeal, MFP's Confirmation Order discharges MFP from all unsecured,

pre-confirmation debts. *Riverwood Int'l Corp. v. Olin Corp. (In re Manville Forest Prods.*

*Corp.)*, 225 B.R. 862, 864 (Bankr. S.D.N.Y. 1998) (citations omitted); *see also Olin Corp. v.*

*Riverwood Int'l Corp. (In re Manville Forest Products Corp.)*, 209 F.3d 125, 127 (2d Cir. 2000).

MFP's Confirmation Order provides that

> [t]he Debtor is discharged and released from any and all unsecured debts which
> arose before the date of confirmation of the Plan, including but not limited to any
> and all Class 3 Claims (as defined in the Plan) . . . , and any and all debts of a kind
> specified [sic] §§ 502(g), 502(h) or 502(i) of the Code whether or not (i) a proof
> of claim based on such debt is filed under § 501 of the Code; (ii) such claim is
> allowed under § 502 of the Code; (iii) such claim is listed on the Debtor's
> Schedules and Lists heretofore filed herein; or (iv) the holder of such claim has
> accepted the Plan.

Graphic's Mot. Ex. M, at 6. MFP's Plan similarly states that

> the Debtor shall be deemed discharged from any debt, except as expressly
> provided in this Plan, which arose before the Confirmation Date . . . , whether or
> not (a) proof of Claim based on such debt has been filed . . . , (b) such Claim has
> been allowed . . . , (c) such Claim is listed on any Schedules filed by the Debtor
> herein, or (d) the holder of such Claim has accepted this Plan.

Graphic's Mot. Ex. L, at 7.  In addition to discharging all unsecured, pre-confirmation debts,

MFP's Confirmation Order enjoins all entities whose debts are discharged from pursuing any

litigation to collect such discharged debt from MFP.  MFP's Confirmation Order provides that

> [a]ll creditors and equity security holders of the Debtor or other entities whose
> debts are discharged or whose rights and interests are terminated by the Plan and
> this Order are individually and collectively permanently restrained and enjoined
> from instituting or continuing any action or employing any process to collect such
> debts or pursue such interests as liabilities or obligations of the Debtor or the
> reorganized Debtor or its successors.

*Id.* at 6–7.  As such, if Ms. Berry holds a pre-confirmation claim against MFP, her claim would

be discharged by the MFP Plan and Confirmation Order.

A debt is defined by the Bankruptcy Code to mean a "liability on a claim."  11 U.S.C.

§ 101(12).  As prior cases have held, "[t]his definition reveals that Congress intended that the

meanings of 'debt' and 'claim' be coextensive." *Riverwood Int'l Corp.*, 225 B.R. at 865 (citing

*Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 552 (1990)).  Under the Bankruptcy

Code, a claim is defined as "a right to payment whether or not such right is reduced to judgment,

liquidated, unliquidated, fixed or contingent, matured, unmatured, disputed, undisputed, legal,

equitable, secured, or unsecured."  11 U.S.C. § 101(5).

MFP's Plan defines a claim synonymously with § 105(5) of the Bankruptcy Code to

mean "a right to payment whether or not such right is reduced to judgment, liquidated,

unliquidated, fixed or contingent, matured, unmatured, disputed, undisputed, legal, equitable,

secured, or unsecured."  Graphic's Mot. Ex. L, at 2.  The legislative history illustrates that "[b]y

this broadest possible definition . . . all legal obligations of the debtor, no matter how remote or

contingent, will be able to be dealt with in the bankruptcy case."  H.R. Rep. No. 95-595, at 309

(1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6266.  It is well established that "Congress

unquestionably expected this definition to have wide scope."  *United States v. LTV Corp. (In re*

*Chateaugay Corp.*), 944 F.2d 997, 1003 (2d Cir. 1991) (discussing the legislative history behind the Bankruptcy Code's definition of a "claim"). The Supreme Court "ha[s] said that 'claim' has 'the broadest available definition,' and ha[s] held that the 'plain meaning of a 'right to payment' is nothing more nor less than an enforceable obligation." *FCC v. NextWave Pers. Commc'ns. Inc.*, 537 U.S. 293, 302–03 (2003) (quoting *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991); *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 559 (1990)).

Per the Bankruptcy Code, a right to payment includes contingent, unmatured, and unliquidated claims. 11 U.S.C. § 101(5). A claim is contingent where "the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event." *Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 303 (2d Cir. 1997) (citations omitted). In other words, the debtor's liability is not yet established. In determining whether a claim exists for purposes of the Bankruptcy Code, it has been said that "a 'claim' can exist under the Code before a right to payment exists under state law." *JELD-WEN, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 121 (3d Cir. 2010).

## WHEN A CLAIM EXISTS UNDER THE BANKRUPTCY CODE

The federal courts have developed several different tests to determine when a prepetition bankruptcy claim arises. The variations of this test are generally classifiable under the "accrual test," the "conduct test," and the "prepetition relationship test." *See In re Piper Aircraft Corp.*, 162 B.R. 619, 624–26 (Bankr. S.D. Fla. 1994), *aff'd as modified sub nom. Epstein v. Official Comm. of Unsecured Creditors (In re Piper Aircraft Corp.)*, 58 F.3d 1573 (11th Cir. 1995). Some sources also include a fourth approach, the "fair contemplation test" or the "foreseeability test," which was developed to include future environmental regulatory claims in the bankruptcy proceedings. *In re Nat'l Gypsum Co.*, 139 B.R. 397, 405–06 (N.D. Tex. 1992); *see also In re*

*Agway, Inc.*, 313 B.R. 31, 42 (Bankr. N.D.N.Y. 2004).    Most courts now rely on a version of the conduct test or the prepetition relationship test.    *See St. Catherine Hosp. of Ind., LLC v. Indiana Family & Soc. Servs. Admin.*, 800 F.3d 312, 315–16 (7th Cir. 2015); *JELD-WEN, Inc.*, 607 F.3d at 122.

The United States Court of Appeals for the Second Circuit appears to use both the relationship test and the fair contemplation test in cases involving regulatory environmental claims and contingent contract claims under the Bankruptcy Code.    *See Olin Corp. v. Riverwood Int'l (In re Manville Forest Prods.)*, 209 F.3d 125, 128 (2d Cir. 2000); *United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1004 (2d Cir. 1991) ("*Chateaugay I*").    In *Chateaugay I*, the court held that the Environmental Protection Agency ("EPA") held prepetition claims for clean-up costs incurred post-confirmation where those costs resulted from the debtor's pre-petition release, or substantial threat thereof, of hazardous materials into the environment. *Chateaugay I*, 944 F.2d at 999–1000.    This included releases the EPA had not determined the debtor was responsible for, and releases the EPA had not even discovered yet.    *Id.* at 999.    The court reasoned that when the clean-up "costs are incurred, EPA will unquestionably have what can fairly be called a 'right to payment.' That right is currently unmatured . . . ."    *Id.* at 1004. The court knew with certainty that the EPA's clean-up costs would give rise to a right to payment, *i.e.*, a claim.    That the costs had not yet been incurred only meant that the claim was contingent.    The court held that the relationship between the EPA, as the regulating government agency, and the debtor, as one subject to the EPA's regulations, made the parties sufficiently aware that the EPA would incur reimbursable clean-up costs.    *Id.* at 1005.    The awareness created by the parties' relationship was enough to render the EPA's future clean-up costs for the debtor's prepetition acts dischargeable, prepetition claims.    *Id.*

Several years later, the Second Circuit was faced with the issue of whether the debtor's bankruptcy filing relieved it of its obligations under the Coal Act to make continuing payments to fund the health benefit scheme the debtor had once guaranteed to its retirees. *LTV Steel Co. v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478, 496 (2d Cir. 1995) ("*Chateaugay II*"). The private health benefit scheme ultimately failed, as the number of mining companies contributing to the fund declined, leaving fewer companies to shoulder the burden of lifetime retirement benefits to former employees. *Id.* at 483. To prevent total default of the funds, the government stepped in with legislation, creating a new payment scheme that required all mining companies with qualified retired employees to contribute a proportionate share to the fund. *Id.* at 485. The debtor argued the required contributions were additional compensation for prepetition labor. *Id.* at 497. The issue was whether the contribution obligations were prepetition debts. The court held that a valid prepetition claim "depends on (1) whether the claimant possessed a right to payment, and (2) whether that right arose before the filing of the petition." *Id.* Effectively, the court held that the legislation creating the "cause of action," or the fund's right to payment, did not exist at the time the debtor filed for bankruptcy. That right to payment did not exist. As such, it could not have created an unmatured right to payment at the time of the petition. In reaching its conclusion, the Second Circuit relied on the fair contemplation test as enunciated in *In re National Gypsum Company*, stating that "[a] claim exists only if before the filing of the bankruptcy petition, the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation – a right to payment – under the relevant non-bankruptcy law." *Chateaugay II*, 53 F.3d at 497 (quoting *In re Nat'l Gypsum Co.*, 139 B.R. at 405).

In the context of a contingent contract claim, the Second Circuit has also relied on the fair contemplation test. *See, e.g., Olin Corp.*, 209 F.3d at 129 (internal quotation marks omitted) (quoting *Chateaugay II*, 53 F.3d at 497). What differs in the contingent contract situation, is the court's definition of a contingent claim. Where the claim objected to arises out of a contract, a dischargeable, contingent claim refers "to obligations that will become due upon the happening of a future event that was within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created." *Olin Corp.*, 209 F.3d at 128 (internal quotations omitted) (quoting *Chateaugay I*, 944 F.2d at 1004). This also forms the basis of the relationship test in *Chateaugay I. See Chateaugay I*, 944 F.2d at 1004–5. The difference between the relationship test and the fair contemplation test is that the fair contemplation test asks whether the relationship has resulted in prepetition conduct that could, in the fair contemplation of the parties, give rise to liability under the non-bankruptcy law. The relationship test asks whether the relationship was one in which both parties knew liability could arise. Although the Second Circuit has applied these tests in cases involving private contracts and other federal statutes, these standards for determining when a claim arises under the Bankruptcy Code have not been conclusively applied by the Second Circuit in the tort context.[4] The most expansive statement the Second Circuit has made is that "[a] claim will be deemed pre-petition when it arises out of a relationship recognized in, for example, the law of contracts or torts." *Chateaugay II*, 53 F.3d at 497.

---

[4] The Second Circuit, without articulating which test it was applying, held that a tort claim for continuing trespass where the initial trespass occurred prepetition and continued postpetiton was a prepetition claim that had been discharged. *Browning v. MCI, Inc. (In re Worldcom, Inc.)*, 546 F.3d 211, 220-21 (2d Cir. 2008) (citing *Chateaugay I*, 944 F.2d at 1003). The Court went on to state that "[a]ny seeming injustice from this result stems . . . from Congress's policy decision to afford reorganizing debtors a fresh start at the possible expense of creditor interests."). *Id.* at 221.

Bankruptcy courts of the Second Circuit have adopted various approaches to determining when a tort claim may be said to arise for purposes of the Bankruptcy Code. *Compare In re Agway, Inc.*, 313 B.R. 31, 42 (Bankr. N.D.N.Y. 2004) (applying the fair contemplation test to find elements of statutory cause of action in negligence were met prepetition), *with In re Quigley Co.*, 383 B.R. 19, 27 (Bankr. S.D.N.Y. 2008) (applying the conduct test to find asbestos claimants exposed prepetition had prepetition claims).

Relying on Second Circuit dicta in *Baldwin-United Corporation Litigation*, this Court has already adopted, in proceedings in this case, an approach to determine when a claim arises. In that Manville decision, issued in 1986, this Court denied relief from the automatic stay to two claimants seeking to pursue state law indemnification and contribution remedies against Manville. *In re Johns-Manville Corp.*, 57 B.R. 680, 681–82, 690 (Bankr. S.D.N.Y. 1986) (quoting *Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United Corp. Litig.)*, 765 F.2d 343, 348 n.4 (2d Cir. 1985)). In that decision, this Court found that the claimants had prepetition claims subject to the automatic stay based on the fact they had both incurred prepetition damages as a result of prepetition events. *Id.* at 686–88. This Court rejected "the state law analysis used by the United States Court of Appeals for the Third Circuit in *Frenville*," as creating an arbitrary classification system based on the timing of events in control of third-parties, *Id.* at 689. Further, this Court reasoned that the state law approach "distorts the underlying policies of the Code in equating a claim with a cause of action for indemnity or contribution under state law notwithstanding the clear pre-petition rooting of the right to payment being sought." *Id.* at 690. The Court determined that "the focus should be on the time when the acts giving rise to the alleged liability were performed . . . ." *Id.* To the extent this Court's analysis has been modified by the Second Circuit's requirement to look for the existence

of a relationship in the tort context, this Court looks to the holdings in other bankruptcy cases involving large numbers of future tort claimants.

### a) Accrual Test

The accrual test, championed by the Third Circuit in *Frenville*, looks to state law to determine when a claim arises under the Bankruptcy Code.  *See Avellino & Bienes v. M. Frenville Co. (In re M. Frenville Co.)*, 744 F.2d 332, 337 (3d Cir. 1984), *overruled by JELD-WEN, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114 (3d Cir. 2010).  The Third Circuit in *Frenville* stated that "while federal law controls which claims are cognizable under the Code, the threshold question of when a right to payment arises, absent overriding federal law, 'is to be determined by reference to state law.'"[5]  *In re M. Frenville Co.*, 744 F.2d at 337 (quoting *Vanston Bondholders Prot. Comm. v. Green*, 329 U.S. 156, 161 (1946)) (citing *In re McMeekin*, 16 B.R. 805, 808 (Bankr. D. Mass. 1982); *Iowa ex rel. Thomas v. Thomas (In re Thomas)*, 12 B.R. 432, 433 (Bankr. S.D. Iowa 1981)).  The Third Circuit has since overruled *Frenville*, noting that the holding has been widely criticized and rejected in other federal circuits.  *In re Grossman's Inc.*, 607 F.3d at 120 (citations omitted).[6]

---

[5] In subsequent case law, the Third Circuit summarized its *Frenville* holding to mean that "the existence of a valid claim depends on: (1) whether the claimant possessed a right to payment; and (2) when that right arose." *Kilbarr Corp. v. Gen. Servs. Admin., Office of Supply & Servs. (In re Remington Rand Corp.)*, 836 F.2d 825, 830 (3d Cir. 1988); *see also In re Grossman's Inc.*, 607 F.3d at 119 ("This court subsequently summarized *Frenville* as holding that 'the existence of a valid claim depends on: (1) whether the claimant possessed a right to payment; and (2) when that right arose' as determined by reference to the relevant non-bankruptcy law.").

[6] In overruling itself, the Third Circuit cited a long list of cases disagreeing with the *Frenville* holding. *See In re Grossman's Inc.*, 607 F.3d at 120 ((citing *Jones v. Chemetron Corp.*, 212 F.3d 199, 205–06 (3d Cir. 2000); *Cadleway Props., Inc. v. Andrews (In re Andrews)*, 239 F.3d 708, 710 n.7 (5th Cir. 2001); *Watson v. Parker (In re Parker)*, 313 F.3d 1267, 1269–70 (10th Cir. 2002); *Am. Law Ctr. PC v. Stanley (In re Jastrem)*, 253 F.3d 438, 442 (9th Cir. 2001); *Epstein v. Official Comm. of Unsecured Creditors (In re Piper Aircraft, Corp.)*, 58 F.3d 1573, 1576 n.2 (11th Cir. 1995); *Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*, 954 F.2d 1, 8 n.9 (1st Cir. 1992); *Grady v. A.H. Robins Co.*, 839 F.2d 198, 200–02 (4th Cir. 1988); *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air. Corp. (In re W.R. Grace & Co.)*, 281 B.R. 852, 860 (Bankr. D. Del. 2002); *Firearms Imp. & Exp. Corp. v. United Capital Ins. Co. (In re Firearms Imp. & Exp. Corp.)*, 131 B.R. 1009, 1015 (Bankr. S.D. Fla. 1991); *In re Pan Am. Hosp. Corp.*, 364 B.R. 839, 843 (Bankr. S.D. Fla. 2007)).

As stated above, this Court has already rejected the *Frenville* accrual test in proceedings in this case. *In re Johns-Manville Corp.*, 57 B.R. 680, 681–82, 690 (Bankr. S.D.N.Y. 1986) (quoting *Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United Corp. Litig.)*, 765 F.2d 343, 348 n.4 (2d Cir. 1985)). Given the fact that the Third Circuit has overruled itself, this Court does not believe a resort to state law is appropriate to determine when a cause of action "accrues" for purposes of asserting a claim under the Bankruptcy Code.

### b) Conduct Test

The conduct test is similar to this Court's decision in the Manville decision denying relief from the automatic stay. The conduct test looks exclusively to when the acts giving rise to liability occurred. *See, e.g.*, *Grady v. A.H. Robins Co.*, 839 F.2d 198, 203 (4th Cir. 1988); *Watson v. Parker (In re Parker)*, 313 F.3d 1267, 1269–70 (10th Cir. 2002). In *Grady*, the United States Court of Appeals for the Fourth Circuit was faced with the issue of whether a tort claimant, Mrs. Grady, had a prepetition claim against a pharmaceutical company, Robins, that filed for bankruptcy on August 21, 1985. *Grady*, 839 F.2d at 198. Robins had manufactured and marketed an intrauterine contraceptive device, called the Dalkon Shield, from 1971 to 1974. *Id.* Prior to the bankruptcy, Mrs. Grady had used a Dalkon Shield. *Id.* She thought it had fallen out. *Id.* Around the time of the bankruptcy, Mrs. Grady developed complications from the still-present device, resulting in surgical removal, pelvic inflammatory disease and ultimately a hysterectomy. *Id.* Mrs. Grady filed a state law claim against Robins and a motion in the bankruptcy court for a determination that she held a post-petition claim that was not subject to the automatic stay. *Id.* The bankruptcy court found Mrs. Grady held a prepetition claim against the debtor, Robins. *See id.* at 199. On appeal, the Fourth Circuit affirmed, holding that in the context of future tort claimants, "when the acts constituting the tort or breach of warranty have

occurred prior to the filing of the petition," the future tort claimant holds a claim for purposes of the Bankruptcy Code. *Id.* at 203.

### c) Prepetition Relationship Test

The conduct test has been criticized by some courts as too broad. *See Epstein v. Official Comm. of Unsecured Creditors (In re Piper Aircraft, Corp.)*, 58 F.3d 1573, 1577 (11th Cir. 1995). These courts, as well as the Second Circuit, require some sort of prepetition relationship to have existed for a claim to have arisen. *See, e.g.*, *Olin Corp. v. Riverwood Int'l (In re Manville Forest Prods.)*, 209 F.3d 125, 129 (2d Cir. 2000) (citations omitted). Although the Second Circuit has not defined what constitutes a sufficient relationship in the tort context, other bankruptcy courts have considered the issue. At the outset, to have a claim under the prepetition relationship test, "there must be some prepetition relationship, such as contact, exposure, impact, or privity, between the debtor's prepetition conduct and the claimant." *In re Piper Aircraft Corp.*, 162 B.R. 619, 627 (Bankr. S.D. Fla. 1994), *aff'd as modified sub nom. Epstein v. Official Comm. of Unsecured Creditors (In re Piper Aircraft Corp.)*, 58 F.3d 1573 (11th Cir. 1995). In *In re Piper*, the debtor had manufactured allegedly defective airplane parts since the 1930s until filing for bankruptcy in 1991. *Id.* at 621. A legal representative filed a claim on behalf of potential future tort claimants, who had yet to identify themselves. *Id.* The bankruptcy court expunged the claim, finding that "the relevant conduct being Piper's prepetition manufacture, design, sale and distribution of allegedly defective aircraft," was not enough to give rise to a claim. *Id.* at 625. The court reasoned that the mere prepetition design and manufacture of the defective products ignored the fact that the legal representative could not "pinpoint which aircraft or parts are defective or, more significantly, who will be exposed to the defective product in the future." *Id.* While the claimants who sought relief from the stay in this Court's Manville

case had clearly been injured prepetition, the potential future claimants in *In re Piper* included

individuals who had not even been exposed to the defective parts. The tortious conduct giving

rise to the liability had not happened yet.

On appeal, the United States Court of Appeals for the Eleventh Circuit affirmed,

reasoning that even the courts relying on the conduct test acknowledge that "focusing solely on

prepetition conduct . . . would stretch the scope of § 101(5)." *Epstein*, 58 F.3d at 1577. The

Eleventh Circuit, designating its test as the "Piper test," held that

> an individual has a § 101(5) claim against a debtor manufacturer if (i) events
> occurring before confirmation create a relationship, such as contact, exposure,
> impact, or privity, between the claimant and the debtor's product; and (ii) the
> basis for liability is the debtor's prepetition conduct in designing, manufacturing
> and selling the allegedly defective or dangerous product.

*Id.* This precise formulation of the prepetition relationship test has been criticized by some. *See,*

*e.g.*, *JELD-WEN, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 125 (3d Cir. 2010)

(discussing criticism by legal scholars and the National Bankruptcy Review Commission).

The Third Circuit, overruling *Frenville*, found that future asbestos claimants exposed to

asbestos prepetition who did not manifest injury until later still held prepetition claims for

purposes of the Bankruptcy Code. *Id.* at 125. The court noted that "[i]rrespective of the title

used, there seems to be something approaching a consensus among the courts that a prerequisite

for recognizing a 'claim' is that the claimant's exposure to a product giving rise to the 'claim'

occurred pre-petition, even though the injury manifested after the reorganization." *Id.* The Third

Circuit ultimately held "that a 'claim' arises when an individual is exposed pre-petition to a

product or other conduct giving rise to an injury, which underlies a 'right to payment' under the

Bankruptcy Code." *Id.* Despite the trend in case law toward a prepetition relationship test, the

notion that a prepetition relationship would always be required for a claim to exist in bankruptcy

has been questioned.  *See St. Catherine Hosp. of Ind., LLC v. Indiana Family & Soc. Servs. Admin.*, 800 F.3d 312, 316 (7th Cir. 2015).

## MS. BERRY HOLDS A PREPETITION CLAIM

In the context of future asbestos claimants, courts have repeatedly found that prepetition exposure to asbestos giving rise to a post-petition injury manifesting constitutes a prepetition claim in bankruptcy.  *See, e.g.*, *In re Grossman's Inc.*, 607 F.3d at 125; *Waterman S.S. Corp. v. Aguiar (In re Waterman S.S. Corp.)*, 141 B.R. 552, 556 (Bankr. S.D.N.Y. 1992), *vacated on other grounds*, 157 B.R. 220 (S.D.N.Y. 1993).  "If the Asbestos . . . Claimant was exposed to asbestos before the . . . petition date, he or she holds a 'claim.'"  *In re Quigley Co.*, 383 B.R. 19, 27 (Bankr. S.D.N.Y. 2008); *In re Lloyd E. Mitchell, Inc.*, 373 B.R. 416, 424 (Bankr. D. Md. 2007) ("A claim arises upon exposure, not manifestation.") (citations omitted).  Using the date of exposure as the act that creates the relationship is not only in line with the Eleventh Circuit's reasoning, it was also central to this Court's decision that future asbestos claimants were parties in interest to the Manville bankruptcy proceedings.  *See In re Johns-Manville Corp.*, 36 B.R. 743, 749–50 (Bankr. S.D.N.Y. 1984).  This Court concludes that under the relationship test set forth by the Second Circuit, a sufficient relationship is formed when the claimant is exposed to the asbestos as a result of the debtor's allegedly tortious conduct.

On the agreed upon facts here, this Court finds that if Ms. Berry were to have a claim against MFP at all, her prepetition exposure to asbestos would give rise to a prepetition claim under the Bankruptcy Code.  Ms. Berry agrees that "the relevant inquiry is when the injured party was *exposed* to the product."  Berry's Opp'n 7.  Ms. Berry admits that "[t]he cause of this disease is clear: [she] was exposed - through unprotected contact with Mr. Berry's clothing - to the asbestos-laden products present throughout the Paper Mill until Mr. Berry's retirement in

2010." *Id.* at 3. Ms. Berry does not dispute that she was first exposed to asbestos prepetition.

*See* Berry's Suppl. Br. 15–16. Ms. Berry argues instead, that due to the fact she was also

exposed to asbestos post-confirmation, her prepetition claim is transformed into a post-petition

injury not subject to discharge in MFP's Plan. *Id.* at 16, 20. Although Ms. Berry argues a

continuing theory of exposure, her papers and her own state court witness admit that there is no

way to determine at what point her cumulative exposure to asbestos became sufficient to cause

her illness. *Id.* at 17–19 (citations omitted).

Ms. Berry's opposition papers attempt to use the inability to pinpoint the precise moment

her exposure caused her mesothelioma to her advantage, claiming that "[b]ecause all exposures

contribute and it is not scientifically plausible to attribute a single exposure or single period of

exposure to the causation of mesothelioma," Graphic's contentions that the prepetition exposures

are to blame are inaccurate. *Id.* at 20. Even if Graphic had argued the only possible cause of

mesothelioma was Ms. Berry's prepetition exposure, that would not matter. Ms. Berry has

admitted there is no way to prove the prepetition exposure did not cause her mesothelioma. *Id.*

at 16. Even more significantly, Ms. Berry's papers acknowledge that her earlier exposures to

asbestos were more likely to have contributed to her contraction of mesothelioma, as opposed to

the later exposures. *See id.* at 19–20.

Ms. Berry's continuing theory of exposure has already been addressed by several state

courts, including in Louisiana where Ms. Berry has brought suit against Graphic. As is

confirmed by reference to these state court decisions, that Ms. Berry was also exposed after

confirmation is of no moment where she admits prepetition exposure would have been sufficient,

and in fact, more likely, to have caused her asbestos-related injuries. The substantial injury

producing exposures here, by Ms. Berry's own admission, were more likely to have occurred

prior to the confirmation date.  Berry's Suppl. Br. 20.  It seems clear that even under Louisiana

law, where Ms. Berry has brought her state court lawsuit against Graphic, Ms. Berry's theories

of continuing asbestos exposure would result in a decision that her claims arose prior to the

petition date of August 26, 1982.  In *Cole v. Celotex Corporation*, the Louisiana Supreme Court

was faced with the decision of whether the Louisiana Comparative Fault Law (the "Act"), which

became effective on August 1, 1980, should be retroactively applied to determine liability in an

asbestos personal injury case.  *Cole*, 599 So. 2d 1058, 1062–64 (Lo. 1992).  To determine

whether application of the Act would constitute retroactive application, the Louisiana Supreme

Court stated that "the determinative point in time separating prospective from retroactive

application of an enactment is the date the cause of action accrues."  *Cole*, 599 So. 2d at 1063.

The *Cole* court then engaged in an analysis of when plaintiffs' asbestos claims had accrued.

Presented with the typical asbestos case where asbestos exposure is followed by a long

latency period prior to manifestation of injury, the *Cole* court acknowledged that "[t]he

difficulties in asbestosis cases arise because, unlike in traditional personal injury cases in which

the damage results from a single, identifiable act causing traumatic injury, in asbestosis cases the

damage results from a continuous process--a slow development of this hidden disease over the

years."  *Cole*, 599 So. 2d at 1065.  In the Louisiana Supreme Court's view, "[t]his lengthy

latency period renders efforts to pinpoint the date on which the disease was contracted virtually

impossible, medically and legally."  *Id.* at 1066 (citations omitted).  It was the very continuous

nature of the exposure that led the Louisiana Supreme Court to conclude that "the key relevant

events giving rise to a claim in long-latency occupational disease cases are the repeated tortious

exposures resulting in continuous, on-going damages, although the disease may not be

considered contracted or manifested until later."  *Id.* at 1066.  The *Cole* court held "that

substantial injury producing exposures giving rise to plaintiffs' claims occurred before the August 1, 1980, effective date of [the Act]," and so the asbestos plaintiffs' claims accrued before that date. *Id.* at 1068.

Although the *Cole* court favored an analysis that looked at when the "substantial injury producing exposures" occurred, the *Cole* court highlighted the fact that the wide recognition of the dangers caused by asbestos in the 1960s and early 1970s brought significant changes that dramatically reduced the possibility of exposure after 1970. "[I]n 1972, the federal government created the National Institute for Occupational Safety and Health ('OSHA'), and OSHA promulgated stringent guidelines in this area; manufacturers stopped using asbestos in their products; and insurance companies ceased issuing policies that adequately covered asbestos-related diseases." *Id.* at 1067 (footnotes omitted).

The Louisiana Supreme Court buttressed its determination with similar findings made by a Washington appellate court in a similar asbestos case involving the retroactive application of a tort reform statute. *Id.* at 1067 (citing *Koker v. Armstrong Cork, Inc.*, 804 P.2d 659 (Wash. Ct. App. 1991)). The *Koker* court found that the asbestos plaintiff's cause of action accrued when the injury producing event takes place, and that the asbestos exposure in the case before it happened in the late 1960s through 1980s. *Koker*, 804 P.2d at 663. In relying on the *Koker* court's reasoning, the Louisiana Supreme Court quoted a footnote from *Koker*, which explained that all the parties before the *Koker* court had "agree[d] that the degree of exposure was less in the later years with the advent of preventative and precautionary measures." *Id.* at 663 n.4. The Louisiana Supreme Court quoted the *Koker* court's holding that "[b]ecause the harm here results from exposure (continuous in nature), it appears that substantially all of the events which can be termed 'injury producing' occurred prior to the adoption of the Act." *Cole*, 599 So. 2d at

1067 (quoting *Koker*, 804 P. 2d at 663–64). In effect, the Louisiana Supreme Court recognized that increased attention to and health regulation of the asbestos industry likely meant that injury producing exposures to asbestos began to lessen after the mid-1970s.

Similarly, Ms. Berry's theories of continuing exposure do not change this Court's conclusion that her repeated prepetition exposures to asbestos should be treated as a dischargeable pre-petition claim against MFP. Even under a substantial injury producing exposure standard that takes into account a theory of continuing exposure, Ms. Berry's asbestos claims arose prior to both MFP and Manville's bankruptcy filing in 1982. The reasoning of the Louisiana Supreme Court in the *Cole* case takes into account the same arguments underpinning Ms. Berry's continuing exposure theory here. Ms. Berry admits that it is scientifically impossible to prove which set of exposures caused her asbestos injuries, and further states that the earlier exposures were more likely to have caused her injuries. According to the Louisiana Supreme Court, the "substantial injury producing exposures giving rise to plaintiffs' claims" were more likely to have occurred prior to 1980, especially given the increased federal oversight of asbestos use and the changes in the industry during the 1970s. *Cole*, 599 So. 2d at 1067, 68. Even considering her continuing exposure theory, this Court sees no reason to conclude Ms. Berry holds a post-petition claim against MFP.

**WHETHER MS. BERRY RECEIVED DUE PROCESS**

Despite the fact Ms. Berry has a prepetition claim against MFP, establishing the existence of a claim "is only the first step in determining whether [Ms. Berry's] claims were discharged." *Placid Oil Co. v. Williams (In re Placid Oil Co.)*, 463 B.R. 803, 815 (Bankr. N.D. Tex. 2012). "Any determination of whether a claim has been discharged 'cannot be divorced from fundamental principles of due process.'" *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,

871 F. Supp. 2d 143, 153 (E.D.N.Y. 2012) (quoting *JELD-WEN, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 125 (3d Cir. 2010)).  This Court finds that as Ms. Berry received due process in MFP's bankruptcy proceedings, any claims Ms. Berry asserts against MFP would have been discharged.

The Supreme Court has held that due process requires notice reasonably calculated to apprise interested parties of the pendency of the action and the opportunity to object.  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (citations omitted).  Actual notice is not required to satisfy due process concerns.  *Dusenbery v. United States*, 534 U.S. 161, 170 (2002).  "The proper inquiry is whether the [party giving notice] acted reasonably in selecting means likely to inform persons affected, not whether [the intended recipient] actually received notice."  *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir. 1988).

The Supreme Court has "recognized that, in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights."  *Mullane*, 339 U.S. at 317 (citations omitted).  "[F]or unknown creditors whose identities or claims are not reasonably ascertainable, and for creditors who hold only conceivable, conjectural or speculative claims, constructive notice of the bar date by publication is sufficient" to satisfy due process.  *In re Chateaugay Corp. Reomar, Inc.*, 2009 WL 367490, at *5 (Bankr. S.D.N.Y. Jan. 14, 2009) (citing *Barry v. L.F. Rothschild & Co. Inc. (In re L.F. Rothschild Holdings, Inc.)*, 1992 WL 200834, at *3 (S.D.N.Y. Aug. 3, 1992); *Castleman v. Liquidating Trustee*, 2007 WL 2492792, at *2 (N.D.N.Y. Aug. 28, 2007); *N.Y. v. N.Y., N. Haven & Hartford R.R. Co.*, 344 U.S. 293, 296 (1953); *Mullane*, 339 U.S. at 317; *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 490 (1988); *Chemetron Corp. v. Jones*, 72 F.3d 341, 348 (3d Cir.1995); *Emons Indus., Inc.*

*v. Allen (In re Emons Indus., Inc.)*, 220 B.R. 182, 185–86 (Bankr. S.D.N.Y. 1998)).  As the

Supreme Court noted in *Martin v. Wilks*, "where a special remedial scheme exists expressly

foreclosing successive litigation by nonlitigants, as for example in bankruptcy or probate, legal

proceedings may terminate preexisting rights if the scheme is otherwise consistent with due

process."[7] *Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989) (citing *NLRB V. Bildisco & Bildisco*,

465 U.S. 513, 529–30 n.10 (1984); *Tulsa Prof'l Collection Servs.*, 485 U.S. at 490).

     Ms. Berry contends that due to the fact she was indirectly exposed to asbestos through

her husband, she was unaware that she may later develop an asbestos injury or that she had a

potential claim against MFP.  Berry Opp'n 15, 17.  Ms. Berry claims that that neither she nor Mr.

Berry had "direct notice" of the MFP bankruptcy, and that Ms. Berry was unaware of MFP's

bankruptcy until she was diagnosed with mesothelioma in 2015.  Berry's Suppl. Br. 10–11.  Ms.

Berry claims it is impossible to provide future, unknown claimants with "adequate due process

notice of the need to assert a claim (which they do not [] know that they have)."  Berry Opp'n 15.

Ms. Berry claims this leaves only one way to provide future unknown claimants with adequate

---

[7] In *Martin v. Wilks*, the Supreme Court addressed the issue of privity and nonlitigants.  In noting that a judgment among parties to a lawsuit does not adjudicate the rights of nonlitigants, the Supreme Court footnoted two exceptions to the requirement of privity.  In addition to the bankruptcy exception, the Supreme Court also noted the exception created for class actions under Federal Rule of Civil Procedure 23, which requires as a prerequisite to a class action that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  One of the driving considerations in a Rule 23 class action case is the ability to bind nonlitigants to the determination of the court, which requires notice and adequate representation of the interests of the class.  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999).  Although the ability to bind a nonlitigant to a proceeding requires notice, it is established law that notice sufficient to satisfy due process does not vary depending on whether the action is *in rem* or *in personam*.  *Mullane*, 339 U.S. at 312–13 ("Judicial proceedings to settle fiduciary accounts have been sometimes termed *in rem*, or more indefinitely *quasi in rem*, or more vaguely still, 'in the nature of a proceeding *in rem*.'  It is not readily apparent how the courts of New York did or would classify the present proceeding, which has some characteristics and is wanting in some features of proceedings both *in rem* and *in personam*.  But in any event we think that the requirements of the Fourteenth Amendment to the Federal Constitution do not depend upon a classification for which the standards are so elusive and confused generally and which, being primarily for state courts to define, may and do vary from state to state.  Without disparaging the usefulness of distinctions between actions *in rem* and those *in personam* in many branches of law, or on other issues, or the reasoning which underlies them, we do not rest the power of the State to resort to constructive service in this proceeding upon how its courts or this Court may regard this historic antithesis.").  *But see Johns-Manville Corp. v. Chubb Indemnity Ins. Co. (In re Johns-Manville Corp.)*, 600 F.3d 135, 153–55 (2d Cir. 2010) (determining that "the bankruptcy court was not exercising its *in rem* power," and as a result the "'special remedial scheme' due process 'exception' relating to *in rem* bankruptcy proceedings" was insufficient to satisfy due process on notice grounds).

due process and that is through the appointment of a future claims representative. *Id.* at 17. Ms. Berry claims that MFP disclosure statement did not provide notice that any future asbestos claim she may have would be channeled to the Manville Trust. Berry's Suppl. Br. 11–14. This Court finds Ms. Berry's assertions to be untenable.

This Court finds that MFP complied with the due process requirements articulated in *Mullane*, which requires that notice be reasonably calculated to apprise interested parties of the pendency of the action and afford them the opportunity to object. *Mullane*, 339 U.S. at 314 (citations omitted). At the time MFP confirmed its chapter 11 plan of reorganization, Ms. Berry agrees she was an unknown, future claimant. *See* Berry's Suppl. Br. 21. MFP gave publication notice of the bankruptcy proceedings and the bar date. *See* Berry's Suppl. Br. Exs. 23–24. This is sufficient in a bankruptcy proceeding where the identity of the creditor is unknown and not reasonably ascertainable. The bankruptcy estate only needs to "make 'reasonably diligent efforts,' to uncover the identities of creditors. For creditors who are not 'reasonably ascertainable,' publication notice can suffice. Nor is everyone who may conceivably have a claim properly considered a creditor entitled to actual notice." *Tulsa Prof'l Collection Servs., Inc.*, 485 U.S. at 490 (citations omitted).

The content of MFP's publication notices were more than sufficient to alert any potential claimant of the conjoined nature of the MFP and Manville bankruptcy proceedings. One of the notices of MFP's confirmation hearing, published in the New Orleans Times-Picayune, includes a joint caption for both "Manville Forest Products Corporation," case number 82-11659, and Manville, case numbers 82-11656 through 82-11676. *See* Berry's Suppl. Br. Ex. 23. Another notice for MFP was published with only the Manville case caption, which included case numbers 82-11656 through 82-11676. *See id.* Ex. 24. The notices explicitly stated that all pre-petition

claims arising prior to August 26, 1982 against MFP would be forever barred.  *Id.*  The notice

advised claimants who had already filed proofs of claim in the Manville case to file amended

proofs of claim against MFP specifically.  *Id.*  The notice further stated that any amended proof

of claim would not affect the proofs of claim already filed in the main Manville case, with

respect to an ability to recover from Manville or the other Manville debtors.  *Id.*  These

publications, offered by Ms. Berry, clearly give notice of MFP's bankruptcy and MFP's

relationship with the other Manville debtors.  *Id.* Exs. 23–24.  It is also apparent from the

publications, that all MFP claimants with claims that arose prior to August 26, 1982 who failed

to file timely proofs of claim would be forever barred from asserting a claim against MFP.  MFP

gave notice that sufficiently advises any potential claimants that MFP's bankruptcy case was

being administered in the context of the larger Manville filing.  This is more than sufficient to

satisfy due process.

    In terms of actual notice, Ms. Berry's papers indicate MFP's undertook a massive effort

to deal with the asbestos crisis at the Mill.  Ms. Berry states that prior to MFP's confirmation,

"MFP made it a point of becoming aware of policies and procedures underlying futile attempts to

work safely with asbestos," and in "September, 1981, representatives of [MFP] attended the

Asbestos Information Association Meeting and prepared a summary report including discussion

of expected safety compliance policies expected from OSHA."  Berry's Suppl. Br. 10.  Ms.

Berry's papers also indicate that MFP's efforts to remove asbestos from the Mill required

"multiple trucks [to] remove even a small portion" of the asbestos.  *Id.*  It appears MFP made

conspicuous attempts to deal with the removal of asbestos from the Mill.

    Although Ms. Berry claims she was unaware of MFP's bankruptcy filing and of MFP's

potential asbestos liability, at least some of MFP's employees in Louisiana had actual knowledge

by 1983 that any action against MFP could not proceed without Manville and would require

consideration of the effect on Manville's bankruptcy case.  *See In re Johns-Manville Corp.*, 34

B.R. 587, 588 (Bankr. W.D. La. 1983).  When MFP filed for chapter 11 in 1982, two groups of

its former employees had pending lawsuits in the United States District Court for the Western

District of Louisiana and in the Fourth Judicial District Court for the Parish of Ouachita, State of

Louisiana.  *Id.* at 589.  In an effort to continue their suits against MFP in Louisiana, the

employee plaintiffs filed an adversary proceeding in the United States Bankruptcy Court for the

Western District of Louisiana against "Manville Forest Products Corporation."  *See id.*  MFP had

not filed for bankruptcy in Louisiana, yet these employee suits were brought there, seeking

termination of MFP's automatic stay in the New York bankruptcy.  *See id.*

On November 10, 1983, the Bankruptcy Court for the Western District of Louisiana

refused to grant relief from the stay and transferred the adversary proceeding to this Court.  *Id.* at

590.  The Louisiana Bankruptcy Court noted that MFP and 20 affiliated entities, collectively

referred to by the Louisiana Bankruptcy Court as "Manville," had filed petitions for

reorganization in the United States Bankruptcy Court for the Southern District of New York.  *Id.*

at 588.  In discussing the Manville bankruptcy filings in New York, the Louisiana Bankruptcy

Court found that

> [the bankruptcy venue statute] must be construed in light of particular
> circumstances of Manville's Chapter 11 proceedings. The New York Bankruptcy
> Court which is responsible for overseeing the Chapter 11 cases herein has
> developed a familiarity and expertise with the unique issues raised by the Chapter
> 11 proceedings. Consequently, the New York Bankruptcy Court is aware that not
> only must Manville deal with the difficulty of formulating a plan or plans for an
> entity of enormous size, but that Manville must also develop in the plan or plans
> of reorganization a method which will address the unique issue of providing
> compensation for asbestos health-related disease and disability to claimants in
> presently pending lawsuits and future potential claimants.  Additionally, the New
> York Bankruptcy Court has become familiar with the factual and legal
> complexities of Manville's Chapter 11 cases and related litigation and with the

individual Chapter 11 proceeding of MFP[] in relation to the proceeding as a whole.

*Id.* at 590.  The Louisiana Bankruptcy Court's ruling makes it clear that MFP's bankruptcy proceedings were intertwined with Manville's, and that asbestos liability would play a factor in MFP's ability to reorganize.  Mr. Berry was an employee at the Mill during this time.  *See* Berry's Suppl. Br. 6 (stating that Graphic caused Mr. Berry's exposure to asbestos from 1961 to 2010).  Mr. Berry filed his claim for asbestos injuries with the Manville Trust.  It is hard to imagine that Ms. Berry could have been completely unaware that the Mill filed for bankruptcy, or that MFP's bankruptcy was linked to Manville's bankruptcy and asbestos litigation.

Notice of the MFP and Manville bankruptcy proceedings is not limited to publication notices or the content of disclosure statements.  "From the inception of [the Manville] case, it has been obvious to all concerned that the very purpose of the initiation of these proceedings is to deal in some fashion with claimants exposed to the ravages of asbestos dust who have not as of the filing date manifested symptoms of asbestos disease."  *In re Johns-Manville Corp.*, 36 B.R. 743, 745 (Bankr. S.D.N.Y. 1984).  As this Court has previously determined, Manville's extensive publicity campaign regarding the confirmation of the Manville Plan "was designed to inform as many future asbestos claimants as possible of the impact of the Manville reorganization upon whatever rights they might have against the Debtor and give them a voice in these proceedings."  *In re Johns-Manville Corp.*, 68 B.R. 618, 626 (Bankr. S.D.N.Y. 1986). Manville's notice was not directed to a limited number of claimants wishing to sue "Manville." The enormous notice campaign provided for "national television and radio advertisements, newspaper advertisements in the six leading U.S. and Canadian newspapers and in the largest circulation daily newspaper in each state, the District of Columbia and each Canadian province." *In re Johns-Manville Corp.*, 68 B.R. at 626.  This Court found that notice was reasonably

calculated to provide notice to all claimants—including unknown claimants like Ms. Berry.  *Id.* at 626–27.

Ms. Berry's assertions that notice to future claimants is impossible are completely irrelevant here.  Berry's Suppl. Br. 21–22.  Ms. Berry arguments are based on a line of reasoning developed in a class action case decided under Federal Rule of Civil Procedure 23.  *See* Berry's Suppl. Br. 21 (citing *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 628 (1997)).  In the class action decision, also involving asbestos litigants, the Supreme Court found that the requirements to establish a class of asbestos plaintiffs under Rule 23(b)(3) had not been satisfied.  *Amchem*, 521 U.S. at 622–28.  The Supreme Court held that the attempt by the asbestos plaintiffs to certify suit as a class did not meet the predominance requirements of Rule 23(b)(3), as the questions affecting individual asbestos victims did not "predominate" over the questions of law or fact common to the group.  *See id.* at 622–625.  The Supreme Court also found that the class did not adequately represent the interests of all class members.  *Id.* at 625–28.  While declining to hold that the notice to the nonlitigant asbestos plaintiffs' of their right to opt-out of the class under Rule 23 was insufficient, the Supreme Court "recognize[d] the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous."  *Id.* at 628.  This notice the Supreme Court was reffering to is the notice from the class representative to other would-be class members that non-litigants must elect to opt out of the class or forever lose their right to sue independently.

Not only was the case decided under Rule 23(b)(3) grounds, the Supreme Court in *Amchem* was not worried about notice to unknown claimants generally speaking.  The Supreme Court was specifically considering the mandatory notice of a putative class members' right to opt-out from the class.  MFP was not giving notice to Ms. Berry for the purpose of establishing

itself as a representative of all asbestos plaintiffs in a class action.  MFP was not giving notice to claimants for purposes of allowing them to opt-out of a certified class.   MFP was giving notice of its confirmation hearing and the bar date for claims against it for purposes of discharge. MFP's right to enjoin future claims is a function of the discharge injunction.  The end result of a bankruptcy proceeding is the discharge and injunction of all prepetition claims against the debtor.  There is no opting-out by creditors.  All prepetition claims that can be discharged under the Bankruptcy Code will be extinguished.  Notice in a bankruptcy case is not for the purpose of allowing a creditor to retain the right to sue the debtor at a later time.  The discharge created by the Bankruptcy Code permanently enjoins any right to sue on a prepetition claim.  The reasoning in *Amchem* simply does not apply here.

Ms. Berry's argument that future asbestos claimants are equivalent to legally incompetent persons, making publication notice insufficient for due process, is without merit.  Berry's Suppl. Br. 24.  The Manville Trust would not exist if due process for future asbestos claimants were impossible.  Moreover, such reasoning would put every discharge in any bankruptcy case at risk of collateral attack by claimants alleging they were unaware they had a claim against the debtor's bankruptcy estate.  Regardless, Ms. Berry's arguments overlook the point that her interests were adequately represented by a future claims representative in the Manville case.

## MS. BERRY'S CLAIMS ARE CHANNELED AND ENJOINED

Although any claim Ms. Berry has against MFP would be a prepetition claim that was discharged and enjoined by the MFP Plan, the Manville Plan preserves Ms. Berry's claim by channeling that claim to the Manville Trust.  The Manville Plan enjoins Ms. Berry's claim in order to save it, and then funnels her claim to the Manville Trust.  *See In re Johns-Manville Corp.*, 68 B.R. 618, 628 (Bankr. S.D.N.Y. 1986).  Ms. Berry retains her right to seek payment on

her claim from the Manville Trust.  That Ms. Berry has any recourse is due to Manville's

establishment of the Manville Trust, which was created for the benefit of both present and future

asbestos claimants, like Ms. Berry.

Manville filed for bankruptcy in the first place due to the existence of an as-yet, unknown

class of future claimants like Ms. Berry.  Of foremost importance here, is that "the very purpose

of the initiation of [Manville's bankruptcy] proceedings [wa]s to deal in some fashion with

claimants exposed to the ravages of asbestos dust who ha[d] not as of the filing date manifested

symptoms of asbestos disease," and it was "in great measure the impact of the future claimants

which necessitate[d] the filing."  *In re Johns-Manville Corp.*, 36 B.R. 743, 745–46 (Bankr.

S.D.N.Y. 1984), *aff'd*, 52 B.R. 940 (S.D.N.Y. 1985).  Two years before Manville confirmed its

plan of reorganization it was "abundantly clear that the Manville reorganization w[ould] have to

be accountable to future asbestos claimants whose compelling interest must be safeguarded in

order to leave a residue of assets sufficient to accommodate a meaningful resolution of the

Manville asbestos-related health problem."  *Id.* at 744.  Although the weight of Manville's then-

pending 16,000 asbestos lawsuits was heavy enough, Manville expected these numbers to be

compounded "over the next 20-30 years by the filing of an even more staggering number of suits

by those who had been exposed but who will not manifest the asbestos-related diseases until

some time during this future period ('the future asbestos claimants')."  *In re Johns-Manville

Corp.*, 36 B.R. 727, 729 (Bankr. S.D.N.Y. 1984).

The Manville bankruptcy proceedings were particularly concerned with the treatment of

the claims of future asbestos claimants.  As summarized by the Second Circuit, "[b]ecause future

asbestos-related liability was the raison d'etre of the Manville reorganization, an important

question at the initial stages of the proceedings concerned the representation and treatment of

what were termed 'future asbestos health claimants' . . . ." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 639 (2d Cir. 1988). Shortly after Manville filed for bankruptcy, and without determining whether the future asbestos claimants had cognizable claims that could be discharged under the Bankruptcy Code, this Court determined that the future asbestos claimants were "parties in interest" under 11 U.S.C. § 1109(b) to Manville's proceeding. As parties in interest, whose "identities are yet unknown," this Court determined the future asbestos claimants needed their own legal representation to preserve their interests in the Manville bankruptcy proceedings. *In re Johns-Manville Corp.* 36 B.R. 743, 757 (Bankr. S.D.N.Y. 1984). This Court granted the motion to appoint a future claims representative to represent the interest of future asbestos claimants on January 23, 1984. *See id.* In appointing the future claims representative, this Court explicitly considered whether the interests of the future asbestos claimants were already represented in the bankruptcy proceedings. This Court determined that the existing Committee of Asbestos Health Related Litigants, made up of lawyers representing present asbestos claimants, was unable to represent both groups as there was a conflict of interest between future asbestos claimants and present asbestos health claimants. *Id.* at 749 n.3.

The Manville Plan, although concerned with future asbestos claimants, was also designed to treat both present asbestos claimants and future asbestos claimants equally. *In re Johns-Manville Corp.*, 68 B.R. 618, 621 (Bankr. S.D.N.Y. 1986), *aff'd sub nom. In re Johns-Manville Corp.*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988). In order to guarantee funds that would be available to both present and future asbestos claimants, the Manville Plan established two trusts, the Personal Injury Settlement Trust, ("Manville Trust") and the Manville Property Damage Trust ("Manville PD Trust"). *See In re Johns-Manville Corp.*, 68 B.R. at 621; *In re Johns-Manville Corp.*, 97 B.R. 174, 176–77

(Bankr. S.D.N.Y. 1989).  "The purpose of the Trust is to provide a means of satisfying Manville's ongoing personal injury liability while allowing Manville to maximize its value by continuing as an ongoing concern."  *Kane*, 843 F.2d at 640.  "The Asbestos Health Trust (the "Trust" or the "AH Trust") is a facility designed to resolve the claims of victims of asbestos-related diseases.  It should be emphasized that this Trust draws no distinction between victims on the basis of the date of the manifestation of their disease."  *In re Johns-Manville Corp.*, 68 B.R. at 621.  The Manville Plan treats future asbestos claims as "other asbestos obligations" ("OAO"), to be funneled into the same claims handling facility which administers the claims of present asbestos victims."  *Id.* at 628.

The Trust was carefully designed to ensure a continuing source of funds would be available to replenish the corpus of the Trust, so that all asbestos victims could be paid.  In confirming the Manville Plan, this Court explained that the Manville Trust would receive annual payments of $75 million from Manville for 24 years, a timeframe which was later extended to 27 years, and would "own or have access to up to 80% of Manville's common stock," and "have the right to call on up to 20% of the profits of the corporation . . . continuing for as long as necessary to satisfy asbestos health claims."  *Id.* at 621; *In re Johns-Manville Corp.*, 97 B.R. at 177.  As this Court has explained,

> [t]he effect of the [Manville] Plan is to enable the reorganized Debtors to continue in the operation of their businesses, make payments to the Trust as provided in the Plan, including the profit sharing, and to allow the Trust ownership of up to eighty percent of the common equity.  The Plan is designed to provide the Trust with funding for so long as is necessary to resolve and pay every AH Claim and Other Asbestos Obligation.

*In re Johns-Manville Corp.*, 97 B.R. at 177.

The successful reorganization of the Manville debtors depended on "the ability of the Trust to compensate the future asbestos-health claimants."  *Id.* at 181.  In no small part, the

success of the Manville Trust depended on the guarantee that "health claims can be asserted only

against the Trust and that Manville's operating entities will be protected from an onslaught of

crippling lawsuits that could jeopardize the entire reorganization effort." *Kane v. Johns-Manville

Corp.*, 843 F.2d 636, 640 (2d Cir. 1988). To this end, the Manville Plan provided for an

injunction, which

> applies to all health claimants, both present and future, regardless of whether they
> technically have dischargeable "claims" under the Code. The Injunction applies to
> any suit to recover "on or with respect to any Claim, Interest or Other Asbestos
> Obligation." "Claim" covers the present claimants, who are categorized as Class-
> 4 unsecured creditors under the Plan and who have dischargeable "claims" within
> the meaning of 11 U.S.C. § 101(4). The future claimants are subject to the
> Injunction under the rubric of "Other Asbestos Obligation," which is defined by
> the Plan as asbestos-related health liability caused by pre-petition exposure to
> Manville asbestos, regardless of when the individual develops clinically
> observable symptoms. Thus, while the future claimants are not given creditor
> status under the Plan, they are nevertheless treated identically to the present
> claimants by virtue of the Injunction, which channels all claims to the Trust.

*Kane*, 843 F.2d at 640. "The permanent injunction provided in Article IX, paragraph

9.2.A(3) of the [Manville] Plan . . . was designed to prevent claimants from interfering

with the reorganized Debtors so they are unimpeded from making the payments required

under the Plan." *In re Johns-Manville Corp.*, 97 B.R. at 177–78.

The equitable injunction in the Manville Plan was also intended to "preserve the rights of

all asbestos claimants by establishing a corpus of funds from which all can collect. In the

absence of the Injunction, the intended beneficiaries of the reorganization will certainly suffer."

*In re Johns-Manville Corp.*, 68 B.R. 618, 626 (Bankr. S.D.N.Y. 1986). The injunction also

serves the purpose of "preventing the inequitable, piece-meal dismemberment of the debtor's

estate." *Id.* at 625.

The Court finds that Ms. Berry holds an "Other Asbestos Obligation" as defined under

the Manville Plan and as interpreted by this Court. Present asbestos claimants were included in

the Manville Plan under the definition of an "AH Claim." *See id.* at 176 ("The ultimate

challenge of these Chapter 11 cases was to formulate a plan of reorganization for the Debtors

which would provide for payment to holders of present or known asbestos health related claims

('AH Claims'), and those persons who had not yet manifested an injury but who would manifest

symptoms of asbestos-related illnesses at some future time ('Other Asbestos Obligations')").

The term "Other Asbestos Obligation" is meant to capture all future asbestos claimants. *See id.*

The Manville Plan defines Other Asbestos Obligations as

> all debts, obligations or liabilities . . . , other than AH Claims, for death, personal
> injuries or personal damages (whether physical, emotional or otherwise) to the
> extent caused or allegedly caused, directly or indirectly, by exposure to asbestos
> (alone or as contained in asbestos-containing products) and arising or allegedly
> arising, directly or indirectly, from acts or omissions prior to the Confirmation
> Date of one or more of the Debtors including, without limitation, all obligations
> or liabilities for compensatory damages (such as loss of consortium, wrongful
> death, survivorship, proximate, consequential, general and special damages) and
> punitive damages . . . .

Graphic's Mot. Ex. N, at 55. There can be no argument that Ms. Berry is now suffering from a

terrible asbestos disease after being exposed to asbestos beginning in 1973. Berry's Opp'n 5.

She claims she was exposed to asbestos as a result of her husband's work at the paper Mill

owned by MFP, which was a wholly-owned subsidiary of Manville. Her exposure to asbestos is

allegedly due to Manville's production of the asbestos at the Mill, or as a result of Manville's

ownership of the Mill itself. Graphic's Mot. 2; Berry's Opp'n 18. The Manville Trust was

established precisely so that future asbestos victims that were exposed to asbestos prior to 1982

and who did not manifest symptoms of any disease until long after confirmation would be able to

recover on their claims. As such, Ms. Berry's claim is channeled to the Manville Trust.

All future asbestos claimants, defined as Other Asbestos Obligation holders, are enjoined

from suing Manville and its subsidiaries. The Manville Confirmation Order provides that "[a]ll

Persons . . . are hereby stayed, restrained and enjoined from taking one or more of the following

actions for the purpose of, directly or indirectly, collecting, recovering or receiving payment of,

on or with respect to any Claim, Interest or Other Asbestos Obligation . . . ."  Graphic's Mot. Ex.

O ¶ 29.  A Person need not be a "creditor" of Manville to be enjoined.  *See Kane*, 843 F.2d at

640.  Nevertheless, this Court has interpreted the Manville Confirmation Order and channeling

injunction to mean that

> [h]olders of AH Claims and Other Asbestos Obligations may proceed only against
> the Trust to satisfy their claims. They must comply with the Claims Resolution
> Procedures as set out in the Plan. These claimants may not sue Manville, its
> subsidiaries or affiliates, and may only commence an action against the Trust in
> accordance with the Claims Resolution Procedures.

*In re Johns-Manville Corp.*, 97 B.R. at 177.

The terms of the Manville Plan and the Manville Trust confirm that Ms. Berry's claim is

channeled to the Manville Trust.  The Manville Plan provides for release of those parties whose

assets are contributed to the Trust assets, requiring all asbestos claimants to proceed against the

Trust.  Graphic's Mot. Ex. N at 6.  The Manville Plan provides that Manville and the other

Debtors are to give certain assets to the Trust, including 24 million shares of Manville common

stock.  *Id.*  In consideration of the assets transferred, the Trust assumed all liabilities for the AH

Claims and Other Asbestos Obligations.  *Id.*  The Trust Agreement, attached to the Manville Plan

and explicitly approved in the confirmation order, explains that the purpose of the Trust is to

provide for the payment of Trust Claims, and to use the Trust assets "to deliver fair, adequate

and equitable compensation to bona fide Beneficiaries, whether presently known or

unknown . . . ."  *Id.* Ex. T, at 3.  A Trust Claim is defined to mean a claim asserting Trust

Liabilities to a Beneficiary.  *Id.* Ex. N, at 59.  A Trust Liability means all Other Asbestos

Obligations and Allowed AH Claims.  *Id.*  A Beneficiary, also a defined term, means a Person

holding a Trust Claim.  *Id.* at 48.

The liability for Ms. Berry's claim was transferred to the Manville Trust as part of the
Manville Plan of reorganization. Per the definitions created by the Manville Plan and the
purpose of the Manville Trust, Ms. Berry's only recourse is as a potential beneficiary of the
Manville Trust. Under the definitions created by the Manville Plan, Ms. Berry is asserting an
"Asbestos Obligation," which is a Trust Liability. Her claim is a claim for personal injuries
caused by exposure to asbestos that began prior to MFP's and Manville's chapter 11 bankruptcy,
through the direct or indirect acts or omissions taken by Manville and its subsidiaries. This is the
very definition of an Other Asbestos Obligation, provided for by the Manville chapter 11 Plan.
As such, Ms. Berry is a "Beneficiary," defined by the Manville Plan as a Person holding a Trust
Claim. Whether she is a bona fide Beneficiary is not at issue before this Court. As her injuries
are included within the sphere of claims delegated to the Manville Trust for administration, she
must proceed with her claims against the Trust.

As stated by this Court, due process for the future asbestos claimants was not only met
met in the Manville bankruptcy proceedings, ensuring that future claimants would be
compensated was the subject of many hours of work by this Court and the lawyers litigating the
case. Were it not for the establishment of the Manville Trust, the claims of the future asbestos
claimants would most likely have been discharged as contingent claims arising prior to the
petition date, with a focus "on the time when the acts giving rise to the alleged liability were
performed . . . ." *In re Johns-Manville Corp.*, 57 B.R. 680, 690 (Bankr. S.D.N.Y. 1986).
Instead, the future asbestos claimants were accorded an interest in the bankruptcy case and given
status as future claimants, with a right to submit a claim to the Manville Trust. As discussed
above, the notice provided to all claimants in Manville's bankruptcy, and the Court's
appointment of an future claims representative clearly complied with the standards for due

process provided in *Mullane*, and then some.  Not only did Manville undertake massive

publication efforts to alert future asbestos claimants to any rights they may have against

Manville,

> the Legal Representative for Future Claimants has been active in the Manville
> reorganization for over two years.  He has been the catalyst for, if not the architect
> of this Plan.  The Legal Representative was endowed upon his appointment with
> the full panoply of statutory rights and duties of representation available to an
> official committee under the Code.  As this court noted, upon the appointment of
> the Legal Representative, binding unknown parties in interest to the outcome of
> judicial procedures in which they have been represented by a trustee, legal
> representative or guardian ad litem acting as a fiduciary for their interests, is not a
> novel phenomenon in the law.

*In re Johns-Manville Corp.*, 68 B.R. 618, 626–27 (Bankr. S.D.N.Y. 1986) (citing *In re Johns-

Manville Corp.*, 36 B.R.743 (Bankr. S.D.N.Y. 1984); *Hatch v. Riggs*, 361 F.2d 559 (D.C. Cir.

1966)).  This Court has previously found that due process was accorded to future asbestos

claimants:

> The goal of the Plan and the purpose of the Injunction is to preserve the rights and
> remedies of those parties, who by an accident of their disease cannot even speak
> in their own interest.  The impracticable, if not impossible version of due process
> envisioned by the Objectors would effectively destroy these rights and remedies.
> Theories and standards of "due process" are nothing more than the human effort
> to make the inchoate notions of justice and equity real and tangible to parties who
> stand before a court of law.  The Objectors' "due process", which would deny
> asbestos victims justice and equity, is not a "due process" at all.

*In re Johns-Manville Corp.*, 68 B.R. at 627.  Ms. Berry, as a future asbestos claimant, in addition

to receiving publication notice of both MFP and Manville's bankruptcy, had her interests

represented during the Manville bankruptcy proceedings by the future claims representative.

Putting aside matters of law, the facts of Ms. Berry's case do not logically support the

conclusion that her claim is not channeled to the Manville Trust.  Ms. Berry's asbestos exposure

is allegedly due to her husband's work at the Mill.  Berry's Opp'n 5.  She was exposed to

asbestos from the dust and fibers he brought home on his clothes.  *Id.*  Mr. Berry later contracted

an asbestos-related injury, and submitted a claim to the Manville Trust.  Graphic's Mot. 1;

Graphic's Suppl. Br. 2.  The Manville Trust determined he was eligible for recovery under the

Trust procedures and reimbursed him on his claim.  Graphic's Mot. 1.  Ms. Berry's exposure was

entirely derivative of her husband's.  The Court does not see how she can assert a claim that she

is entitled to sue the surviving corporate entities, when her husband was not.  There is no logical

or rational reason to allow Ms. Berry to subvert the procedures that were designed to preserve

the rights of all asbestos claimants, especially when her husband, the indirect source of her

exposure, was bound by them.

Instead of agreeing to submit her claims to the Manville Trust, as her husband did, Ms.

Berry contends she is entitled to more than all the other future asbestos claimants.  Ms. Berry

asserts her claims against MFP make her special and unique, and that even though MFP is a

subsidiary of Manville, MFP should not be covered by the Manville Plan or injunction.  Ms.

Berry does not dispute that MFP was a subsidiary of Manville,[8] nor does Ms. Berry argue the

Manville Plan's definition of subsidiary excludes MFP.  Tr. 15:13–16:12.  Ms. Berry instead

asserts that the Manville channeling injunction only channels claims that are derivatively

asserted against Manville's successors for the conduct of Manville.  Ms. Berry argues her claim

against MFP is a direct claim based on MFP's acts or omissions.  Berry's Opp'n 2; Tr. 16:18–24.

Although Ms. Berry claims the definition of subsidiary does not specifically include

MFP, subsidiary is defined in the Manville Plan "with respect to any Person [sic] any corporation

or other entity of which securities or other ownership interest having ordinary voting power to

elect a majority of the board of directors or other Persons performing similar functions are at the

time directly or indirectly owned by such Person."  Graphic's Mot. Ex. N, at 58.  This definition

---

[8] It is undisputed that Graphic is a successor in interest to MFP.  Berry's Opp'n 6; *see also* Graphic's Mot. 6;
Graphic's Suppl. Br. 7.

clearly includes MFP. As to whether the definition of "subsidiary" should be limited to only derivative claims against such subsidiaries based on Manville's conduct, the language of the Manville Plan and Confirmation Orders clearly refute this interpretation.

The Manville Confirmation Order provides that "[a]ll Persons . . . are hereby stayed, restrained and enjoined from taking one or more of the following actions for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Claim, Interest or Other Asbestos Obligation," including

> [c]ommencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding . . . against or affecting the Debtors, any of the Debtors' Subsidiaries, . . . or any property of any of the foregoing or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing, or any property of any such transferee or successor . . . .

Graphic's Mot. Ex. O, at ¶ 29. This definition clearly enjoins suit against subsidiaries of Manville by any person to collect on any interest, including an Other Asbestos Obligation.

As stated above, the provision of the Manville Plan providing for "Other Asbestos Obligations" is meant to capture all future asbestos claimants. The Manville Plan defines "Other Asbestos Obligations" as

> all debts, obligations or liabilities . . . , other than AH Claims, for death, personal injuries or personal damages (whether physical, emotional or otherwise) to the extent caused or allegedly caused, directly or indirectly, by exposure to asbestos (alone or as contained in asbestos-containing products) and arising or allegedly arising, directly or indirectly, from acts or omissions prior to the Confirmation Date of one or more of the Debtors . . . .

Graphic's Mot. Ex. N, at 55. Based on the definition of Other Asbestos Obligations, the Manville Plan and Confirmation Order specifically enjoins the litigation of personal injury suits and suits for damage, caused indirectly or directly by exposure to asbestos, arising "directly or indirectly, from acts or omissions" attributable to Manville. Damages that are directly or

indirectly caused by exposure to asbestos and arising from direct or indirect acts of Manville would include acts or omissions committed by Manville's subsidiaries: that includes MFP here. Claims against MFP based on its ownership of the Mill are also claims that could be asserted against Manville, as the indirect owner of the Mill.  As previously explained, claims against Manville's subsidiaries and successors are specifically enjoined by the Confirmation Order.  This shows that indirect acts of Manville or any of the Debtors would include acts of their subsidiaries.  Further, this Court has interpreted the Manville injunction as prohibiting suit by holders of Other Asbestos Obligations, which includes Ms. Berry, against Manville's subsidiaries.  *In re Johns-Manville Corp.*, 97 B.R. 174, 177 (Bankr. S.D.N.Y. 1989).

Further, the Second Circuit has previously dismissed arguments by asbestos claimants that the Manville injunction improperly benefits Manville subsidiaries that were not debtors in bankruptcy and as a result should not protect these subsidiaries from asbestos claims.  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643 n.4 (2d Cir. 1988).  Even for non-debtor subsidiaries, the Second Circuit has found that while "they may not lawfully be protected from creditors' claims if they are separate, viable entities in which Manville can shield its assets," they are still entitled to benefit from the injunction where "the subsidiaries either have been sold and their proceeds made part of the debtor's estate or are foreign corporations owned entirely by the Trust." *Kane*, 843 F.2d at 643 n.4 (citing *In re Unishops, Inc.*, 494 F.2d 689, 690 (2d Cir. 1974); *Feldman v. Trustees of Beck Industries, Inc. (In re Beck Industries, Inc.)*, 479 F.2d 410, 416 (2d Cir.), *cert. denied*, 414 U.S. 858 (1973)).

Here, MFP was not a "non-debtor subsidiary."  MFP was a debtor in bankruptcy and, more importantly, it was an original Manville debtor.  MFP filed its bankruptcy case as part of the original Manville bankruptcy filing.  MFP's case was jointly administered with the other

Manville entities that filed for bankruptcy. *See* Berry's Suppl. Br. Exs. 23–24. It was well

known that MFP filed bankruptcy along with the other Manville debtors, even in Louisiana. *In

re Johns-Manville Corp.*, 34 B.R. 587, 588 (Bankr. W.D. La. 1983). As a subsidiary of

Manville, MFP's bankruptcy case was integrally linked to Manville's reorganization

proceedings, and the disposition of MFP's assets and rights affected property of the Manville

bankruptcy estate. *See id.*; *see also In re Manville Forest Products Corp.*, 1983 U.S. Dist.

LEXIS 15457, at *7 (S.D.N.Y. July 14, 1983).

Even if MFP were somehow considered a non-debtor subsidiary of Manville, Manville

did not use MFP to shield its assets. Instead, MFP's profits and earnings were accessible by

Manville. This Court has previously "made reference to the fact that [MFP] represents a major

component of the assets of the Manville companies." *In re Manville Forest Products Corp.*,

1983 U.S. Dist. LEXIS 15457, at *7 (S.D.N.Y. July 14, 1983). MFP's Plan included Manville in

the Class 6 claims category, as the "holder of the shares of common stock of the Debtor . . . ."

Berry Suppl. Br. Ex. L, at 7. Manville remained a majority shareholder of MFP after bankruptcy

and was able to draw directly upon MFP's assets, and MFP's profits went to fund the Manville

Trust. *See Clay v. Riverwood Int'l Corp.*, 157 F.3d 1259, 1261 (11th Cir. 1998). Manville took

action on the belief it had the ability to reach MFP's assets in order to satisfy Manville's

obligation to fund the Manville Trust. *Id.*

Manville retained the obligation to fund the Manville Trust pursuant to the terms of the

Manville Confirmation Order and Plan. This Court has explained in a decision post-

confirmation that "[b]eginning in the fourth year after the Consummation Date, the Trust is to

receive $ 75,000,000 per year from Manville for twenty-seven years." *In re Johns-Manville

Corp.*, 97 B.R. 174, 177 (Bankr. S.D.N.Y. 1989). Additionally, "[t]he Trust will own or have

access to eighty percent of Manville's common stock.  The Trust will have the right to draw on

up to twenty percent of Manville's profits beginning in the fifth year after the Consummation

Date and continuing for as long as is necessary to satisfy obligations of the Trust."  *Id.*  Further,

"[t]he effect of this Plan will be to give the 'tort victims' the beneficial interest in the ongoing

operating corporate entity."  *In re Johns-Manville Corp.*, 68 B.R. 618, 621–22 (Bankr. S.D.N.Y.

1986).  As such, even if MFP were a non-debtor, its assets went to fund the Manville Trust and

were not shielded from the reach of Manville.

The Supreme Court has held that the Manville Confirmation Order is *res judicata* "to the

parties and those in privity with them, not only as to every matter which was offered and

received to sustain or defeat the claim or demand, but as to any other admissible matter which

might have been offered for that purpose."  *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 152

(2009) (internal quotation marks omitted) (citing *Nevada v. United States*, 463 U.S. 110, 130

(1983)).  The Manville Plan and channeling injunction apply to any effort by Other Asbestos

Obligation claim holders to sue Manville and its subsidiaries.  This injunction applies to Ms.

Berry, as she holds an Other Asbestos Obligation.  She received due process in the Manville

proceedings.  For all the reasons stated above, the Manville Confirmation Order is *res judicata*

and Ms. Berry's only recourse is to submit her claim to the Manville Trust.

## GRAPHIC HAS NOT WAIVED ITS RIGHT TO THE BANKRUPTCY INJUNCTION

The Court must also reject Ms. Berry's argument that Graphic waived its right to rely on

the confirmation orders of MFP and Manville based on separate asbestos litigation against

Graphic.  The discharge injunction provided by the Bankruptcy Code is not extinguished by a

debtor's initial failure to assert the protection of the injunction.  This would vitiate the entire

purpose of the bankruptcy discharge.  The discharge operates to void a judgment of personal

liability against the debtor at any time obtained where that judgment is for a dischargeable debt.

11 U.S.C. § 524(a).  It is established law that "in 1970 the bankruptcy discharge lost its status as

an affirmative defense.  Thereafter, judgments establishing the personal liability of debtors on

certain prepetition debts were 'null and void' and creditors were enjoined from collection."  *Lone

Star Sec. & Video, Inc. v. Gurrola (In re Gurrola)*, 328 B.R. 158, 168 (B.A.P. 9th Cir. 2005).

The bankruptcy discharge is not an affirmative defense that can be waived.  Neither is the

injunction.

<u>Conclusion</u>

For the foregoing reasons, Ms. Berry's claims against Graphic in her state court action,

currently pending in the Fourth Judicial District for the Parish of Ouachita in the State of

Louisiana, seeking to recover for any injuries resulting from her exposure to asbestos are hereby

enjoined pursuant to MFP's discharge injunction and the Manville channeling injunction.  To the

extent Ms. Berry asserts claims in her state court action against Manville or MFP seeking to

recover for any injuries resulting from her exposure to asbestos, they too are enjoined pursuant to

the discharge injunction.  Ms. Berry's only recourse is to submit a claim to the Manville Trust.

The Court will issue a separate order in conformity with this opinion.



/s/ Cecelia G. Morris
_____
**Dated: June 30, 2016**                                            **Hon. Cecelia G. Morris**
       **Poughkeepsie, New York**                          **Chief U.S. Bankruptcy Judge**